IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CARRINGTON MORTGAGE SERVICES, LLC<br>1600 South Douglass Road<br>Suite 110 & 200A<br>Anaheim, CA  92806,<br><br>       Plaintiff,<br><br>v.<br><br>KEVIN DeLORY<br>223 Kirby Avenue<br>Warwick, RI  02889<br><br>And<br><br>KENNETH PHILLIPS<br>269 Hamilton Street<br>Providence, RI  02907<br><br>And<br><br>EQUITY PRIME MORTGAGE, LLC<br>A Georgia Limited Liability Company<br>5 Concourse Parkway, Suite 2250<br>Atlanta, GA  30328<br><br>       Defendants. | Civil Action No. |

**PLAINTIFF CARRINGTON MORTGAGE SERVICES, LLC'S
COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff, Carrington Mortgage Services, LLC ("CMS" or "Carrington"), for its Complaint for Injunctive Relief against Defendants, Kevin DeLory ("DeLory"), Kenneth Phillips ("Phillips) and Equity Prime Mortgage ("EPM"), (collectively identified herein as "Defendants"), states and alleges the following:

1

## INTRODUCTION

1. CMS brings this claim against Defendants seeking injunctive and related equitable relief for Defendants' coordinated campaign to raid CMS's Warwick Rhode Island office of its key employees, misappropriate its Confidential Information and solicit its customers using its proprietary and Confidential Information. Pursuant to the parties' agreement, CMS will seek additional legal relief through arbitration as to the individual Defendants. As discussed below, this action arises from breaches of various contractual obligations by the individual Defendants, former employees of CMS, and EPM's assistance and complicity in said breaches and misappropriation of CMS's proprietary and trade secret information. Such breaches include the individual Defendants soliciting CMS employees and misappropriating CMS's trade secrets and Confidential Information. Such actions violate certain restrictive covenants set forth in the employee agreement labeled "Associate Confidentiality & Nondisclosure Agreement" ("Agreement") DeLory and Phillips entered into with CMS at the start of their employment.

## PARTIES

2. CMS is a Delaware limited liability company. CMS's members are Carrington Holding Company, LLC and Carrington Investment Partners, L.P. Carrington Holding Company, LLC is a Delaware limited liability company, whose sole member is The Carrington Companies, LLC. Carrington Investment Partners, L.P. is a Delaware limited partnership, whose general partner is Carrington Capital Management, LLC, and whose limited partners are two natural persons who are not citizens of the state of Rhode Island. Carrington Capital Management, LLC is a Delaware limited liability company, whose members are Carrington Holding Company, LLC and a natural person. The natural person is not a citizen of the state of Rhode Island. The

Carrington Companies, LLC is a Delaware limited liability company, whose members are two natural persons who are not citizens of the state of Rhode Island.

3. Defendant, Kevin DeLory is an individual who, upon information and belief, is a citizen of Rhode Island, residing at 223 Kirby Ave, Warwick, Rhode Island 02889.

3. Defendant, Kenneth Phillips, is an individual who, upon information and belief, is a citizen of Rhode Island, residing at 269 Hamilton Street, Providence, Rhode Island 02907.

4. Defendant Equity Prime Mortgage LLC, is a Georgia limited liability company who, upon information and belief, has its registered address at 5 Concourse Parkway, Suite 2250, Atlanta, Georgia 30328 and is involved in a competitive business to that of Plaintiff herein. It has a branch office in Rhode Island.

## JURISDICTION & VENUE

5. Jurisdiction over this matter arises under 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1367 (supplemental jurisdiction). CMS is not a Rhode Island citizen. Both individual Defendants are Rhode Island citizens, Defendant EPM has an office in Rhode Island and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff has asserted a claim under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same operative facts as its federal claim.

8. This Court has personal jurisdiction over Defendants because Defendants have conducted business, and have substantial contacts, in Rhode Island.

9. Venue is proper in this Court under 28 U.S.C. § 1391(a) because the individual Defendants reside in this district and the events or omissions giving rise to the claims against Defendants occurred and continue to occur in this district and they are both employed by Defendant EPM's Rhode Island office.

**FACTS**

10. The mortgage lending division of CMS is a residential wholesale and retail loan originator, licensed to originate residential loans in 48 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. CMS is a HUD approved mortgagee, a VA approved lender/servicer, an approved Ginnie Mae issuer, a Freddie Mac approved seller/servicer and a Fannie Mae approved seller/servicer. CMS originates government-insured, conventional agency and non-agency mortgage loans through multiple lending channels. At issue herein is its wholesale channel where CMS uses licensed third party brokers to obtain business. The CMS Wholesale Division accounts for approximately forty percent (40%) of CMS's loan origination business.

11. Since its incorporation in 2007, CMS has developed strong relationships in this niche wholesale market with its approximately 7,000 brokers who must pass a rigorous Broker Approval Process to do business with CMS. CMS exerts significant efforts and costs to protect its highly developed business strategies, internal processes and protect its relationships with brokers and customers that it has developed over years of effort and which are extremely valuable to CMS and gives CMS a competitive advantage by and through these strategies, processes and innovative plans.

12. CMS has also built and cultivates its internal programs, practices, processes, and compilations of information that have inherent economic value because they are not generally known or readily ascertainable by others in the industry and through which significant goodwill

has been established. CMS's marketing, training and support services enhances and cultivates this goodwill and CMS relies on these trade secrets to sustain and build its business.

13. To protect these valuable assets, and for good and valuable consideration, CMS has taken at least commercially reasonable precautions under the applicable facts and circumstances to prevent its innovative ideas, processes, technologies, business strategies and detailed non-public customer lists from being known and/or disclosed to the public. As one measure, CMS employees have to use passwords to access the CMS information. It also requires each of its high level employees and managers to sign employment agreements containing confidentiality/non-disclosure and non-solicitation provisions at the commencement of such employees' employment. This includes its Sales Managers and Account Executives.

14. Both individual Defendants signed CMS's Confidentiality & Nondisclosure Agreement (the "Agreement") at the start of their employment with CMS and as consideration for their employment with CMS. **Exhibit A-B**. The Agreement contains confidentiality/non-disclosure and non-solicitation provisions. Paragraph B of the Agreement includes the following language:

> (i) Associate [Employee] understands and agrees that Confidential Information provided to Associate by Carrington or learned by Associate in connection with his/her employment with Carrington shall be maintained by Associate as strictly confidential and shall not be disclosed to any third party except as otherwise provided under the terms of this Agreement. (emphasis added)
> (ii) Associate shall not duplicate, reproduce or copy Confidential Information (whether in hard copy, electronic or other form) except as necessary to perform services for Carrington. Copies of Confidential Information (including computers containing Confidential Information) shall remain on the premises of Carrington unless expressly authorized by Carrington.
> ….

  (x)  Immediately upon termination of Associate's employment with Carrington or upon written notice to Associate from Carrington, all Confidential Information in written or document form shall be returned to Carrigan…

Confidential Information is defined, in relevant part, in Paragraph A of the Agreement as:

> . . . any and all information disclosed by Carrington to Associate during the course of his or her employment and shall include, without limitation, (i) business and financial information including but not limited to, customers, investor names, limited partner names, financial information, products and systems, (ii) trade secrets, works of authorship, software programs and software source documents and inventions, (iii) business plans, financial statements, business methods or proposals or similar information, (iv) sales and marketing information, training and operations material, memoranda and manuals, personnel records and manuals, pricing information and (v) information relating to individual mortgage loan borrowers including, but is not limited to, any non-public personal information of the borrowers (as defined in Title V of the Gramm-Leach-Bliley Act), financial information pertaining to individual mortgage loan borrowers, credit history, income and names or list of individual borrowers derived from nonpublic personally identifiable information. Associate acknowledges that Carrington has an obligation to keep certain Confidential Information strictly confidential and agrees to assist Carrington with that obligation.

15. The Agreement also has a provision prohibiting the individual Defendants from soliciting CMS's employees and customers for a period of twelve (12) months following the termination of their employment. Such provisions (Paragraph B, subsections xi-xii):

  (xi)  Associate agrees that, for a period of one year after the termination of Associate's employment with Carrington, Associate will not, directly or indirectly, induce or attempt to induce any of Carrington's Associates to leave their employment with Carrington.

  (xii)  Associate agrees that, for a period of one year after the termination of Associate's employment with Carrington, Associate will not contact or otherwise solicit, directly or indirectly, any person that was a customer or client of Carrington during the period that Associate was employed with Carrington, for the purpose of (i) causing such customer or client to sever its relationship with Carrington, or (ii)

6

>>selling or otherwise providing any product or service that Carrington is in the business of selling or otherwise providing.

**DeLory's Employment with CMS**

16. Defendant, Kevin DeLory, began his employment with CMS on June 10, 2013, at which time he signed the Associate Confidentiality & Nondisclosure Agreement as part of his onboarding.

17. Most recently, Defendant DeLory served as the Area VP of Sales in CMS's Wholesale Mortgage Division, working out of the Warwick, Rhode Island office.

18. On August 15, 2021, CMS terminated Defendant DeLory's employment because of poor performance.

19. At the time of his termination, Mr. DeLory shared that he was not surprised he was being terminated and revealed he already had plans in place to leave.

20. Immediately after his termination, Mr. DeLory began working for a competitor, Equity Prime Mortgage, LLC ("EPM"), as Chief Lending Officer. Mr. DeLory rented office space on behalf of EPM in the same building in Warwick, Rhode Island where CMS has its office.

21. Both prior to and subsequent to his termination from CMS, Mr. DeLory communicated with his CMS co-workers, soliciting them to come work with him at EPM and, upon information and belief, encouraging CMS employees to print or forward CMS confidential, proprietary and trade secret information to him.

22. On August 19, 2021, after discovering that Mr. DeLory had been soliciting CMS employees for other employment at competitor EPM, CMS emailed Mr. DeLory, reminding him that his conduct violated the Agreement, and demanding that he cease the solicitation immediately. CMS informed DeLory that if he did not stop, it would act to enforce the Agreement.

23. On August 26, 2021, CMS, through counsel, sent Mr. DeLory a cease and desist letter, reminding him of his contractual obligations to CMS, including the non-disclosure and non-solicitation provisions.

24. To date, Mr. DeLory has succeeded in recruiting thirteen CMS employees, including Defendant Phillips, to come work with him at EPM. These employees are high level employees each with knowledge of CMS confidential, proprietary and trade secret information. There are now ten Account Executives and three Sales Leaders (including Defendants) who have moved to EPM. This accounts for approximately thirty percent (30%) of the East Coast CMS wholesale sales team. The resignations were all submitted in an extremely short time frame leaving CMS with a substantial gap in its workforce in Rhode Island. There were also more than ten unsuccessful attempts by Defendant DeLory to recruit other CMS employees.

25. Additionally, just prior to his termination, on August 10-12th, Defendant DeLory used his CMS computer to access CMS's confidential, proprietary and trade secret information and print an excessive number of documents, totaling about two reams of paper. Among the documents printed were many highly sensitive and confidential documents related to CMS's Business Strategy for the Wholesale Division. Upon information and belief, Defendant DeLory took these printed documents with him from CMS to EPM, as no such printed documents were found in CMS's offices upon Defendant DeLory's departure. Further, Defendant DeLory would have no legitimate reason to have printed out hundreds of pages of these documents while planning to leave CMS. To date, these documents have not been returned to CMS.

26. For example, the newly developed Business Strategy Plan with innovative marketing, financial and other strategic materials developed by CMS and which is *not* used by any

other mortgage company in the United States, was printed four times by Defendant DeLory. This plan is about to be implemented by CMS, and took substantial time, effort and money to develop.

27. One of the other documents printed by Defendant DeLory was CMS's Processor Advantage document, which includes CMS's proprietary information and is used on the Company's most highly strategic projects.

28. Upon information and belief, the information in these documents is now being used by DeLory's new employer EPM to unfairly gain a competitive advantage in the market and unfairly compete with CMS. None of the CMS documents printed or otherwise retained by Defendant DeLory have been returned.

**Phillips' Employment with CMS**

29. Defendant Kenneth Phillips began working at CMS on June 10, 2013 at which time he signed the Associate Confidentiality & Nondisclosure Agreement as part of his onboarding.

30. Defendant Phillips worked for CMS in its Warwick, Rhode Island office for about eight years, most recently serving as a Regional Sales Manager.

31. On August 19, 2021, Defendant Phillips unexpectedly submitted his resignation to CMS and, upon information and belief, is now with EPM, after Defendant DeLory recruited him.

32. CMS searched Defendant Phillips's email on his CMS computer after he resigned to determine whether he had used, taken or disclosed any of CMS's confidential and proprietary information. The search revealed that on August 10, 2021, Phillips sent approximately twenty-eight (28) different emails from his CMS email to his personal email, attaching proprietary and Confidential Information belonging to CMS. Specifically, Mr. Phillips sent himself CMS's customer lists (current and prospective), CMS's broker forms and lists of brokers CMS has

relationships with, as well as documents and presentations related to CMS's Business Strategy and plans with regard to the Wholesale Division.

33. On August 26, 2021, CMS sent Defendant Phillips a cease and desist letter, reminding him of his contractual obligations to CMS, including the non-disclosure provision and the provision requiring him to return all CMS property, including documents and emails he forwarded to his private email. No CMS documents have been returned by Defendant Phillips.

**Equity Prime Mortgage LLC (EPM)**

34. EPM is the new employer of the individual Defendants as well as an additional 11 former CMS employees from its Rhode Island office. It is a competitor with CMS in the Wholesale Market which is a highly specialized market catering to non-conforming mortgages and government mortgages such as FHA, HUD and VA loans. These are the same product lines as CMS's Wholesale Division.

35. CMS, through counsel, spoke to EPM counsel and requested written assurances that said employees were not using CMS information and to immediately halt any activity related to CMS's customers, brokers and/or other proprietary information. No such assurances were provided.

## CLAIMS

### COUNT I- BREACH OF CMS AGREEMENT
### (AGAINST INDIVIDUAL DEFENDANTS)

36. CMS realleges and incorporates by reference the allegations in paragraphs 1 through 35 above as though fully set forth herein.

37. Each individual Defendant entered into their respective Agreement with CMS in exchange for good and valuable consideration, including their employment with CMS.

38. CMS has fully performed its obligations under such Agreements.

39. Defendants have breached and/or will continue to breach the confidentiality provisions of their respective Agreements by failing to return, misappropriating and using CMS's confidential and proprietary information to transact business on behalf of EPM.

40. Upon information and belief, Defendants have breached and/or will continue to breach the non-solicitation provisions of their respective Agreements by soliciting, or trying to solicit, customers of CMS with whom Defendants transacted business, directly or indirectly, or learned the identify of while CMS employed them.

41. Upon information and belief, Defendants have breached and/or will continue to breach the non-solicitation provisions of their respective Agreements with CMS by soliciting, or trying to solicit, employees of CMS to end their employment with CMS and work at EPM.

42. Said Individual Defendants have also failed to return CMS documents as required by their respective Agreements.

43. CMS seeks preliminary and permanent injunctive relief to enjoin and restrain Defendants from engaging in any further conduct that breaches their respective Agreements. Unless enjoined, and all documents and materials are returned to CMS, the conduct of said individual Defendants will cause great and irreparable injury to CMS's business, harming the relationships between CMS and its brokers and customers in its Wholesale Division both by the solicitation of employees and use/misuse of CMS Confidential Information.

44. CMS has no adequate remedy at law and will suffer substantial and immediate irreparable harm unless the Court enjoins said individual Defendants as requested, particularly as its new and innovative Business Strategy Plan for its Wholesale Division is about to be launched.

45. The Court's denying this relief will inflict greater injury upon CMS than the Court's granting this relief will inflict upon Defendants.

46. Along with the injunctive relief to which CMS is entitled, the individual Defendants' breaches of their respective Agreements entitle CMS to recover damages suffered, which CMS will seek through arbitration.

## COUNT II – DEFEND TRADE SECRETS ACT
## (AGAINST THE INDIVIDUAL DEFENDANTS)

47. CMS realleges and incorporates by reference the allegations in paragraphs 1 through 46 above as though fully set forth herein.

48. The federal Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1832, *et seq.*

49. "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information."

50. During their employment with CMS, the individual Defendants had access to confidential and proprietary information that constituted CMS's trade secrets and in particular with respect to its Wholesale Mortgage Division. As described above, this included, but was not limited to, business strategies and plans, marketing plans, financial information, and information regarding CMS's business relationships with customers and brokers. In particular, the broker information was not generic information that can be looked up online, but included the Broker Approval Process information that in and of itself is highly sensitive and proprietary information as the brokers seeking approval must submit financial information, credit reports, licensing information, and CMS also tracks the number of loans and amounts of loans transacted with each broker.

51. Documents and information that constitute CMS's trade secrets also include its Business Strategy Plan as detailed above for its Wholesale Division which CMS does not believe

is in effect anywhere else in the country. Individual Defendants and direct competitor EPM now have this information.

52. This information has and will continue to be used by CMS in interstate commerce.

53. This trade secret information is: (i) not known outside CMS; (ii) known only by CMS employees, including the individual Defendants, and others involved in the business and marketing at CMS; (iii) subject to reasonable measures to guard the secrecy of the information, including password protected computer systems and CMS's non-disclosure agreements; (iv) valuable; and (v) extremely difficult for competitors to properly acquire or independently duplicate.

54. The individual Defendants knew that they had a duty, pursuant to the Agreement and CMS's policies, to maintain the secrecy of CMS's Confidential Information, including trade secrets, as evidenced by their secretive and duplicitous printing and/or forwarding of documents to their personal emails just prior to separating from CMS.

55. Defendants have, and will continue to use, CMS's Confidential Information, including trade secrets, to directly compete with CMS and alter CMS's relationship with its customers and brokers in the Wholesale market and to erode or diminish CMS's market share as well as obtain an unfair head start based on CMS's new and innovative business strategy in this niche space.

56. Defendants have copied, converted, disclosed and/or used this information without CMS's knowledge, consent, or authorization to benefit them in a manner that has caused, and will continue to cause, irreparable harm to CMS.

57. Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

58. Defendants' actual and continuing misappropriation is knowing and willful and they have refused and continue to refuse to return the information or cease and desist using same.

59. Unless Defendants are enjoined, CMS will lose a portion of its competitive advantage in the business in which the companies directly compete, and will lose, among other things, customers, and business expectations, and goodwill, for which there is no adequate remedy at law. Accordingly, CMS seeks injunctive relief to prevent Defendants' actual and threatened misappropriation of CMS's Confidential Information, including trade secrets.

### COUNT III- BREACH OF DUTY OF LOYALTY
### (AGAINST DELORY ONLY)

60. CMS realleges and incorporates by reference the allegations in paragraphs 1 through 59 above as though fully set forth herein.

61. By virtue of his employment with CMS, Defendant DeLory owed a duty of loyalty to CMS. His duties required him at all times to, among other things, act in the best interests of CMS.

62. Defendant DeLory breached his duties to CMS when he engaged in the above-referenced conduct, while still employed by CMS as well as when he left CMS and misappropriated CMS's proprietary, confidential and trade secret information and solicited CMS long-term employees.

63. Such actions, while DeLory was still employed by CMS, were contrary and detrimental to CMS's interests.

64. Defendant DeLory took affirmative steps to conceal his misconduct.

65. As Defendant DeLory breached his duties to CMS while still employed by CMS, CMS is entitled to the return of any compensation paid to DeLory during his respective periods of disloyalty.

66. As a direct and proximate result of DeLory's breach of his duties of loyalty, CMS has sustained and will continue to sustain, irreparable injury and substantial damage.

### COUNT IV- TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST EPM)

67. CMS incorporates by reference paragraphs 1 through 66 above as though fully set forth herein.

68. EPM intentionally and improperly interfered with CMS's contractual relationships with DeLory and Phillips by continuing to employ them, despite knowledge of their ongoing obligations to CMS under the Agreement.

69. Upon information and belief, EPM has also used CMS Confidential Information taken by said individual Defendants and has aided and abetted the individual Defendants' solicitation of CMS employees.

70. As a direct and proximate result of the improper interference, CMS has suffered and will continue to suffer substantial damages and financial losses as a result of a loss of thirteen employees, lost business and lost profits in an amount presently unknown but, for the purposes of the Complaint, estimated to exceed $75,000.

WHEREFORE, CMS respectfully requests (a) entry of a preliminary and permanent injunction preventing the individual Defendants from soliciting any additional CMS employees to work at EPM; (b) entry of a preliminary and permanent injunction enjoining Defendants from making any further use, disclosure of CMS's confidential and proprietary information; and (c) such other and further relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE,** CMS respectfully requests that the Court grant the following relief:

1. Enter a preliminary and permanent injunction enjoining the individual Defendants from directly or indirectly soliciting, calling upon, selling or rendering services to any customers or prospective customers of CMS (a) with whom the individual Defendants did business, (b) had contact with, or (c) the identity of whom is known to the individual Defendants as a result of their employment with CMS, for a period of twelve (12) months from the date of that order and/or injunction;

2. Enter a preliminary and permanent injunction enjoining individual Defendants from directly or indirectly soliciting any CMS employees to leave their employment with CMS, for a period of twelve (12) months from the date of that order and/or injunction;

3. Enter a preliminary and permanent injunction enjoining Defendants from maintaining possession of, using, or disclosing to any third party, any confidential or proprietary information belonging to CMS, including any customer lists, strategy documents, or other trade secret information;

4. Enter an order requiring the individual Defendants immediately return any and all Confidential Information, including trade secrets of CMS, in their possession or control including all copies and reproductions and an order for a forensic analysis and image of Defendants' EPM and home computers to look for CMS confidential and proprietary information and/or confirm that same is no longer present;

5. As against the individual Defendants, attorneys' fees pursuant to their Agreement;

6. As against EPM, damages;

7. Award CMS such other and further relief as the Court deems just and proper.

Respectfully submitted,

CARRINGTON MORTGAGE SERVICES, LLC

By its attorneys,

*/s/ Jonathan R. Shank*
Jonathan R. Shank, RI # 8008
Jonathan.Shank@jacksonlewis.com
Erik J. Winton
(*Pro Hac Vice Forthcoming)*
Erik.Winton@jacksonlewis.com
Sarah E. Lovejoy
(*Pro Hac Vice Forthcoming*)
Sarah.Lovejoy@jacksonlewis.com
JACKSON LEWIS P.C.
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Dated: September 10, 2021

4836-5152-8186, v. 2