# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| CARRINGTON MORTGAGE SERVICES, LLC, | ) ) ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) ) | C.A. No. 21-cv-366-JJM-PAS |
| KEVIN DELORY, KENNETH PHILLIPS, KEITH RUSSELL, EVERETT JACKSON, EDUARDO PEREZ JR., and EQUITY PRIME MORTGAGE, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge

Plaintiff Carrington Mortgage Services ("Carrington") sued former employees Kevin DeLory, Kenneth Phillips, Keith Russell, and Everett Jackson ("Individual Defendants") alleging that they solicited employees and mortgage brokers after they left the company in 2021 with the help of Defendants Eduardo Perez, Jr. and Equity Prime Mortgage ("Equity Prime"), gutting Carrington's Wholesale Mortgage Division and costing up to $10 million in lost profits.

Carrington claims breach of contract, misappropriation of trade secrets, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference with contracts. ECF No. 121. Carrington moves for summary judgment on its five claims. ECF No. 127. Equity Prime opposes Carrington's motion and cross-moves for partial summary judgment on the tortious interference and aiding and

abetting breach of fiduciary duty claims, arguing that there was nothing illegal about the Individual Defendants' actions and disclaims any knowledge or intent to interfere with contracts.  ECF Nos. 125, 138.

Mr. DeLory filed Counterclaims against Carrington under the Rhode Island Whistleblower Protection Act ("RIWPA"), for common law retaliatory discharge, and breach of contract.  Mr. Jackson also filed Counterclaims for breach of contract and for overtime violations of the Fair Labor Standards Act ("FLSA") and the Rhode Island Minimum Wage Act ("RIMWA").  Mr. Jackson cross-moved for partial summary judgment on his overtime claims.  ECF No. 126.  Carrington also moves for summary judgment on all five Counterclaims.  ECF No. 127.  Carrington moves to strike part of Mr. Jackson's supporting deposition testimony.  ECF No. 134.

The Court considers each of these motions in turn.

## I.    BACKGROUND[1]

### A.    Facts Related to Breach of Contract

Carrington is an integrated mortgage company that offers retail and wholesale lending services.  ECF No. 128 ¶ 1.  Messrs. DeLory and Phillips worked for Carrington for over eight years, between 2013 and 2021 as senior vice-president of Carrington's Wholesale Division and regional sales manager, respectively.  *Id.* ¶¶ 11,

---

[1] The record pleadings, specifically the Statements of Disputed and Undisputed Facts and responses thereto, are so argumentative–rather than a statement of facts– as to be almost useless to the Court in deciding these motions except that they highlight that almost every fact here is disputed.

18. Mr. DeLory was known as the "Tom Brady of mortgages" and worked closely with Mr. Phillips.  ECF No. 151 ¶ 255.

Each of the Individual Defendants signed employment agreements–a Non-Disclosure Agreement ("NDA") and a Compensation Plan.  ECF No. 128 ¶¶ 12, 13, 19, 20, 24, 25, 29, 31.  These contracts prohibit both employee and broker solicitation, directly or indirectly, for one year.  As to employees, the NDA states:

> Associate agrees that, for a period of one year after the termination of Associate's employment with Carrington, Associate will not, directly or indirectly, induce or attempt to induce any of Carrington's   Associates to leave their employment with Carrington.

ECF No. 121 ¶ 21.  As to brokers, the NDA imposes a general ban on business contact with brokers:

> Associate will not contact or otherwise solicit, directly or indirectly, any person that was a customer or client of Carrington during the period that Associate was employed with Carrington, for the purpose of (i) causing such customer or client to sever its relationship with Carrington, or (ii) selling or otherwise providing any product or service that Carrington is in the business of selling or otherwise providing.

*Id.*

The Compensation Plan contains the same terms as to both employees and brokers:

> In consideration of your employment, with the Company you agree that while you are employed, and for one year following termination of your employment with the Company and/or its affiliates, you will not directly or indirectly solicit, induce or otherwise encourage any person to leave the employment of, or terminate any customer, vendor or other business relationship with, the Company, its parent, or any of their respective subsidiaries and affiliates.

*Id.* ¶ 22.

3

Finally, the Individual Defendants signed Confidentiality Agreements that include nondisclosure language prohibiting use and disclosure of confidential information. Specifically, that:

(i) Associate understands and agrees that Confidential Information provided to Associate by Carrington or learned of by Associate in connection with his/her employment is strictly confidential and shall not be disclosed to any third party except as otherwise provided under the terms of this Agreement.

(ii) Associate shall not duplicate, reproduce, or copy Confidential Information (whether in hard copy, electronic, or other form) except as necessary to perform services for Carrington. Copies of Confidential Information (including computers containing Confidential Information) shall remain on the premises of Carrington unless expressly authorized by Carrington.

(iii) Associate shall disclose Confidential Information only to Associates or agents of Carrington that have a need to know such Confidential Information in connection with the services performed by Associate for the benefit of Carrington.

(iv) Immediately upon termination of Associate's employment with Carrington or upon written notice to Associate from Carrington, all Confidential Information in written or document form shall be returned to Carrington.

*Id.* ¶ 20. "Confidential information" is defined as follows:

[A]ny and all information disclosed by Carrington to Associate during the course of his or her employment [including] without limitation (i) business and financial information including but not limited to, customers, investor names, limited partner names, financial information, products and systems; (ii) trade secrets, works of authorship, software programs and software source documents and inventions; (iii) business plans, financial statements, business methods or proposals or similar information; (iv) sales and marketing information, training and operations material, memoranda and manuals, personnel records and manuals, pricing information and (v) information relating to individual mortgage loan borrowers including, but is not limited to, any non-public personal information of the borrowers . . . .

*Id.*

There is no dispute that these agreements were in effect when Mr. Perez, owner and CEO of Equity Prime, began recruiting Messrs. DeLory and Phillips in April 2021. ECF No. 151 ¶¶ 255-56. From the start of the courtship, Mr. DeLory emailed Mr. Perez with details about his Carrington team, including the number of account executives in the Warwick office, the volume and type of loans they generated, management structure, and compensation terms for current Carrington employees. ECF No. 128 ¶¶ 49-55; ECF No. 130-15 ("DeLory Email"). He attached a blank copy of a confidential Carrington document, the Inside Account Executive Compensation Plan, from the year before. ECF No. 151 ¶ 263. The document was marked "confidential" and included the confidentiality and non-solicitation provisions at issue. Mr. Perez asserts that he did not request the document but does not dispute receiving it. *Id.* ¶ 264. He maintains he was only recruiting Messrs. DeLory and Phillips and had no conversations about recruiting other team members. *Id.* ¶ 265. Mr. DeLory closed the email by saying, "I'm looking for the last stop of my career and need to make sure this works for the team most importantly."[2] *Id.*

Mr. Perez planned a trip to Rhode Island to meet with Messrs. DeLory and Phillips in person. *Id.* ¶ 258. Prior to this visit, Mr. Phillips emailed a "Q-and-A" document to Messrs. Perez and DeLory. ECF No. 128 ¶ 59. Mr. Perez said the questions were "great" and asked if he should answer by email or "on a call with the group so they hear it from us?" *Id.* ¶ 60. The questions included a discussion of how

---

[2] Mr. DeLory says he "never provided [Equity Prime] with anything from Carrington," (ECF No. 129-25 at 3) but Equity Prime—in its statements of undisputed facts—does not deny that this email was sent with the attachment.

to handle broker approval, a question about staffing, and information about Carrington Account Executive Compensation Plans. *Id.* ¶ 62. Shortly after this, Mr. Perez and two other Equity Prime representatives flew to Rhode Island to meet Messrs. DeLory and Phillips in person where they had dinner with Mr. DeLory, Mr. Phillips, Mr. Russell, and other senior members of the Carrington Wholesale Division ("Recruiting Dinner") and Equity Prime later hosted a meeting in the same building as Carrington's Rhode Island offices ("Recruiting Event") that other Carrington employees attended. *Id.* ¶¶ 56, 65-85. Equity Prime disputes many details of these events. ECF No. 139 ¶¶ 65, 72, 74-5, 77, 80-82.

The parties dispute whether Carrington employees understood these to be recruiting events. *Id.* ¶ 82. Carrington alleges these events were like "job fairs" designed to recruit current employees; Equity Prime insists that Messrs. DeLory and Phillips were always the target audience, and that other employees simply attended by happenstance. *Id.* ¶ 80. Mr. DeLory admitted that he and Mr. Phillips told other Carrington employees about the Recruiting Dinner and Recruiting Event but maintains that they did not "solicit" their attendance.[3] ECF No. 128 ¶ 71. Equity Prime representatives had created a PowerPoint presentation that listed Mr. DeLory as Chief Lending Officer and Mr. Phillips as Senior Vice-President of Lending,

---

[3] When asked about the Recruiting Event, Mr. DeLory testified he did not "solicit them and say, you should come. If they heard about a meeting and they asked Mr. Phillips or I, can I come, it's far different than me going out and saying, you need to come." ECF No. 143-2 at 22. Equity Prime testified that it played no role in inviting employees and states that when it referred to whether just Messrs. DeLory and Phillips would be attending or if there would be "others," it was referring to their spouses. ECF No. 139 ¶ 89.

respectively, of Equity Prime.[4]  It is undisputed that Carrington employees received paper copies of the presentation as part of these events.[5]  *Id.* ¶ 85.

The day after the Recruiting Event, Mr. Perez texted Messrs. DeLory and Phillips and said it was a "great day" and offered to set up a call with "you guys or the group."  *Id.* ¶ 88; ECF No. 131-18.  They proceeded to have a series of conversations about staffing.  ECF No. 128 ¶ 89-92; ECF No. 139 ¶¶ 89-90.  Soon after, Mr. Phillips emailed documents from his Carrington email to his personal email, including a planning presentation, broker forms, and a list with performance data for different account executives ("Phillips Work Files").  ECF No. 139 ¶ 93.  The parties dispute why these files were sent and whether they were confidential (*see id.* ¶¶ 93, 162-68), but do not dispute that Carrington files were removed.  *Id.* ¶ 93.  Carrington claims Mr. DeLory printed its entire broker database, as well as Account Executive Production information, and that his printer was running "nonstop" in the days before he left Carrington.  ECF No. 143-1 at 7-8.  Jeffrey Massotti, a Carrington employee, testified that Mr. DeLory "walked out the door with them waving over his head saying, ['P]aper gold, boys, paper gold.[']."  *Id.* at 6.  Mr. DeLory denies this

---

[4] Mr. DeLory later asked that his name be removed.  The parties dispute how his name came to be on the presentation and why it was removed, but Equity Prime does not dispute that it was originally included.  ECF No. 128 ¶ 78.  Mr. Perez testified that he did not create the document but made some edits, including correcting the spelling of Mr. DeLory's name.  He claims the presentation was solely intended to help Mr. Phillips and Mr. DeLory in their future roles at Equity Prime.  ECF No. 139 ¶ 80.

[5] The only version in the record is a paper copy with Mr. DeLory's name omitted but Messrs. DeLory and Perez both admitted in deposition that Mr. DeLory's name was included on an earlier version.  ECF No. 128 ¶ 85.

claim.  ECF No. 139 ¶¶ 94-95.  Mr. DeLory claims he had no plans to leave Carrington and did not ask Mr. Perez to recruit other account executives.

Carrington terminated Mr. DeLory on August 15, 2021 for poor performance, citing a Carrington employee who resigned in response to Mr. DeLory's poor leadership skills.  ECF No. 128 ¶ 199.  Carrington claims that other employees described Mr. DeLory as "combative, aggressive, bullying, dramatic, argumentative, negative, [who] likes to throw bombs and grenades," blamed him for creating a hostile work environment, and reported that he was "almost exclusively focused on his Rhode Island team, to the detriment of the remaining wholesale division."  *Id.* ¶¶ 205-06.

Mr. DeLory promptly accepted a job with Equity Prime.  *Id.* ¶ 97. Messrs. DeLory and Phillips then attended lunch with Carrington employees and spoke with them at a golfing event ("Fire Pit Discussion"); the details of these encounters are highly disputed.  ECF No. 139 ¶ 117.  A text thread between Carrington employees the day after Mr. DeLory was terminated shows that they discussed resigning together and were waiting for offers from Equity Prime.  ECF No. 131-25.  Many employees were seeking other employment at the time Mr. Phillips and Mr. DeLory left Carrington.  ECF No. 142-9 at 10; ECF No. 142-10 at 10. Mr. Phillips resigned, along with eleven other Carrington employees who all went to Equity Prime.  ECF No. 128 ¶¶ 119-121; ECF No. 139 ¶ 121.

Before resigning, Mr. Phillips emailed Mr. Perez proposed salary information for twenty-four Carrington Account Executives and four Carrington sales managers ("Phillips Employee List").  ECF No. 139 ¶ 103.  The parties dispute whether the list

included salary information from Carrington, or whether these were simply proposed Equity Prime recommendations.  *Id.*  Neither party disputes that salary information was sent.  Mr. Perez testified that he did not know where Mr. Phillips acquired the salary information and had no direct communication with Carrington employees but authorized Human Resources to prepare offer letters.[6]  ECF No. 140 ¶¶ 274-75.  Some employees received offers without ever being interviewed.  ECF No. 128 ¶¶ 114-15, 128.  Mr. Phillips testified that he and Mr. DeLory provided contact information and followed up with individuals who had not yet made the switch.  *Id.* ¶ 116.  None of the former Carrington employees testified that Messrs. DeLory and Phillips solicited them.

The parties fiercely dispute what was said, who said what, and whether these contacts rise to the level of solicitation.  The parties dispute whether Mr. Perez communicated with Messrs. DeLory and Phillips about recruiting other Carrington employees.  ECF No. 151 ¶ 265.  They dispute whether Mr. DeLory or Mr. Phillips asked Mr. Perez to recruit other employees.  *Id.* ¶ 266.  They dispute whether Mr. DeLory had conversations with Carrington employees before he was terminated encouraging them to leave Carrington.  *Id.* ¶ 267.  And they dispute whether Carrington encouraged employees to leave.  Equity Prime says that Carrington encouraged employees who wanted to follow Mr. DeLory to do it "sooner rather than later," thus encouraging a voluntary exodus.  *Id.* ¶ 279.

---

[6] Mr. DeLory asserts that he had nothing to do with the offer letters being sent out.  Mr. DeLory had been installed as Equity Prime's hiring manager.  ECF No. 128 ¶¶ 110-11.

Messrs. DeLory and Phillips continued to speak with Carrington employees after they left Carrington. Eleven days after terminating Mr. DeLory, Carrington sent cease-and-desist letters telling Mr. DeLory, Mr. Phillips, and Mr. Russell not to solicit employees or customers. ECF No. 128 ¶ 133. Mr. DeLory says that he instructed his team that former Carrington employees could call Carrington brokers if (1) the broker had recently done business with Equity Prime, or (2) if the broker called them first. *Id.* ¶ 139. Equity Prime required every former Carrington Account Executive to state in writing that:

> Employee's employment with [Equity Prime] will not violate or conflict with any obligations Employee owes to any other individual or entity, including without limitation, obligations arising out of or relating to (i) any non-compete, non-disclosure, non-solicitation or confidentiality agreements or provisions, and (ii) any prior employer or employment.

ECF No. 139 ¶¶ 140-42. Despite this agreement, Messrs. Jackson, Russell, and Phillips reached out to multiple brokers they had worked with at Carrington. ECF No. 128 ¶¶ 146-52. Mr. Jackson also stated that he had spoken with Carrington Account Executives "about their leaving Carrington to join Equity Prime," and that he had done so with Mr. DeLory's blessing. *Id.* ¶ 158.

In summary, Carrington alleges that Messrs. DeLory and Phillips "raided" the Carrington Wholesale Division, soliciting other employees to switch companies in violation of their employment contracts. These employees solicited mortgage brokers to make the switch using Carrington's confidential information. While the record shows many contacts between former and current Carrington employees and brokers, Equity Prime maintains that these contacts were all legitimate, denies that Mr. Perez

knew about Carrington's non-solicitation and Confidentiality Agreements, and disputes whether the information was confidential.

## B.    Facts Related to Defendants' Counterclaims

### 1.    Retaliatory Discharge (Counts I and II–Mr. DeLory)

Mr. DeLory counterclaims under the RIWPA, R.I. Gen. Laws § 28-50-2, and common law that he was unlawfully terminated because he reported to Carrington that it was engaging in fraudulent mortgage practices.  He asserts that he complained about fraudulent loan practices in May 2021 and was told in August 2021 that he would be branded a "troublemaker" for continuing to raise the issue.  He claims that his firing was pretextual and other employees left to protest Carrington's fraudulent practices and hostile work environment.  Mr. DeLory also asserts that he was fired because he raised concerns in 2018, 2019, and 2020 that Carrington executives had made egregious comments about employees of color, women, and members of the LGBTQ community.

### 2.    Breach of Contract and Overtime Claims (Counts III, IV, and V–Messrs. DeLory and Jackson)

Mr. DeLory argues that he talked to Mr. Austin who told him that his compensation would increase from what he was being paid under his current Compensation Plan.  The actual document was never rewritten and signed.  He argues that Carrington later refused to pay him under the more lucrative term–a claim that Carrington denies.  Additionally, Mr. Jackson brings claims for unpaid overtime against Carrington under the FLSA (29 U.S.C § 207(a)) and the RIMWA (R.I. Gen. Laws § 28-12-1). He asserts that he often worked more than forty hours per

week and was not paid overtime wages.  He argues that Carrington knew he worked overtime but had a policy to not pay and discouraged workers from entering overtime hours into the time recording system.  Carrington disputes this by pointing to the record that it says shows that Mr. Jackson was paid overtime when his time records reflected more than forty hours.

## II.    STANDARD OF REVIEW

A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A party can show a genuine dispute by citing to materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by showing that the materials cited either do not establish a genuine dispute or are not supported by admissible evidence.   *Id.* Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact" because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial.  *Id.* at 323.

Here there are competing motions, and so the Court will review each motion independently and evaluate each motion "in the light most favorable to the nonmoving party." *Dahua Tech. USA Inc. v. Feng Zhang*, 988 F.3d 531, 539 (1st Cir. 2021) (citations omitted). The summary judgment standard does not change when parties cross-move; each motion is viewed "separately, through this prism." *Est. of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).

## III. DISCUSSION–CARRINGTON'S CLAIMS

### A. Count I–Breach of Contract (Individual Defendants)

Carrington claims that the Individual Defendants violated the terms of its NDA and Compensation Plan by soliciting other employees and brokers to move to Equity Prime as part of a coordinated exodus in violation of these agreements. The Court starts its analysis by reviewing the terms of the agreements before considering Carrington's Motion for Summary Judgment, especially considering Equity Prime's argument that the broker non-solicitation provision is unenforceable.

#### 1. The Contractual Provisions

The parties do not challenge the clarity of the contract terms and the Court agrees that they are not ambiguous. Given this legal conclusion, the Court will enforce the plain terms of a contract. *Judd Realty, Inc. v. Tedesco*, 400 A.2d 952, 955 (R.I. 1979).[7] The plain language of the Individual Defendants' employment agreements prohibits solicitation, directly or indirectly, of employees and brokers for

---

[7] Diversity jurisdiction is invoked and so the Court applies Rhode Island law to this and all state claims. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

one year.  The agreements also include nondisclosure language prohibiting use and disclosure of confidential information, which is unambiguously defined.

To prove breach of contract, Carrington must show agreement, breach, causation, and damages.  *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010).  There is no dispute that all four Individual Defendants signed the agreements regarding Carrington employees and brokers.  These agreements impose restrictive covenants on Carrington employees, so the Court must analyze (1) whether Defendants breached their agreements with Carrington, and (2) whether these provisions are enforceable under Rhode Island law.  *Nestle Food Co. v. Miller*, 836 F. Supp. 69, 73 (D.R.I. 1993).

### 2.    Breach of Contract

Because Messrs. DeLory, Phillips, Jackson, and Russell are alleged to have breached different parts of their agreements, the Court analyzes these provisions separately as to each Defendant, beginning with the question of breach.

### a.    Did Messrs. DeLory and Phillips Breach the Agreement by Soliciting Employees?

By their plain terms, the NDAs and Compensation Agreements forbid direct solicitation, indirect solicitation, and all forms of "induce[ment]" or "encourage[ment]" of existing Carrington employees for one year.  Rhode Island law is silent on the definition of "direct" and "indirect" solicitation, but the parties agree that direct solicitation means "any active verbal or written encouragement to leave [the company]," and indirect solicitation means "subtle hints and encouragement" where "the finder-of-fact is satisfied that the solicitor actually *intended* the solicited

to leave [the company]." *See Advanced Micro Devices, Inc. v. Feldstein*, No. CV 13-40007-TSH, 2013 WL 10944934, at *11 (D. Mass. May 15, 2013).[8]

Applying this standard to employees and taking all the facts in the light most favorable to the nonmoving party, the Court finds that Carrington has failed to establish as a matter of law that the Individual Defendants recruited employees to Equity Prime, either directly or indirectly. Equity Prime acknowledges that there was contact between the Individual Defendants and Carrington employees but argues that "not every contact [is] sufficient to establish a solicitation," there is no evidence of "encouragement," and "intent" is a question best left for the factfinder. The Court agrees; most of the facts underlying the communications between Messrs. DeLory and Phillips and Carrington employees are either disputed or unknown. Messrs. DeLory and Phillips have repeatedly stated that they did not tell anyone to leave Carrington. *See, e.g.*, ECF No. 143-2 at 174. Carrington employees learned about opportunities at Equity Prime but there are disputes about how they came to learn of them and from whom. There are disputes about how these other employees came to the Recruiting Dinner and Event. Both Messrs. DeLory and Phillips and Equity Prime specifically deny inviting them to either directly or indirectly induce them to move to the new firm. One employee stated that "the entire office" gathered for the Fire Pit Discussion and "everyone collectively" discussed going to Equity Prime. ECF No. 129-17 at 2. But there does not appear to be any evidence in the

---

[8] *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 11 (1st Cir. 2013) (citation omitted) (a court should look to sister state court precedents where its state is silent on an issue).

record that any of the Individual Defendants asked Carrington employees to follow them to Equity Prime; there is testimony that when some employees heard that Messrs. DeLory and Phillips were leaving, they approached one or both of these Individual Defendants to say they wanted to move to Equity Prime.  ECF No. 151 ¶¶ 280, 283; ECF No. 128 ¶¶ 105-07; ECF No. 139 ¶¶ 122, 126.  On this record, a jury could decide that the other Carrington employees were unhappy there, had been looking for other employment, and, upon learning that two of their leaders and perhaps others were leaving, decided to move to a different firm.

These disputes lead the Court to conclude that "[w]ithout additional information regarding the content of [the] communications . . . or [the Defendant's] particular motivations," Carrington's motion as to breach of contract cannot be decided as a matter of law.  *Advanced Micro Devices*, 2013 WL 10944934, at *10.  And intent, especially when it is proved through testimony subject to credibility judgment, is a question for the factfinder, and the Court finds that a reasonable jury could find that it was lacking here.

As to the breach of confidentiality, the parties dispute that these files were confidential, ECF No. 139 ¶¶ 163-168, that Mr. Phillips shared information about Carrington Compensation Plans, and emailed performance data for account executives to his personal email, *id.* ¶ 93, and that he also passed on salary information to Equity Prime on behalf of Carrington employees who were looking for new opportunities.  *Id.* ¶ 103.  Equity Prime argues that there are disputes over whether the information is outdated, publicly available on Carrington's website, or

16

could easily have been reconstructed from public records and were thus not confidential. Again, this issue must go to a jury.

Before the Court moves to Carrington's motion as to the evidence against the Individual Defendants' solicitation of brokers, it must first consider Equity Prime's argument that the broker non-solicitation provision is unenforceable.

### b. Is the Broker Provision Enforceable?

Equity Prime argues that subsections (i) and (ii) of the NDA barring contact with prior Carrington customers for the purpose of "causing [a] customer or client to sever its relationship with Carrington" or "selling or otherwise providing any product or service" offered by Carrington are unenforceable because they are unreasonably overbroad, not tailored to a legitimate business interest, and harm mortgage loan borrowers. ECF No. 127. "[A]bsent an enforceable noncompetition agreement, former employees . . . can solicit their previous employer's customers for business as long as, in doing so, they are not acting tortiously…." *Long v. Atl. PBS, Inc.*, 681 A.2d 249, 253 (R.I. 1996).

Under Rhode Island law, non-compete agreements are "disfavored and subject to strict judicial scrutiny." *Cranston Print Works Co. v. Pothier*, 848 A.2d 213, 219 (R.I. 2004). This case involves non-solicitation clauses—not non-competes[9]—but the

---

[9] Non-competes preclude ex-employees from working for other firms. Non-solicitation agreements permit ex-employees to move but limit the type of contact they may have with colleagues and clients. Non-competes are subject to strict scrutiny, but Rhode Island courts will often uphold non-solicitation provisions within an overbroad non-compete agreement to tailor enforcement to a legitimate business interest. *See, e.g.*, *Koppers Prod. Co. v. Readio*, 197 A. 441, 445 (R.I. 1938); *Nestle*, 836 F. Supp. at 76.

Court agrees that the appropriate test based on the contract language at issue is similar. To prove enforceability, Carrington must first show "that the provision is ancillary to an otherwise valid transaction or relationship, and that 'the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs.'" *Id.* (quoting *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1053 (R.I. 1989)). "When considering the validity of a noncompetition agreement, the crucial issue is reasonableness, and the test is dependent upon the particular circumstances surrounding the agreement." *Durapin*, 559 A.2d at 1053. A restraint is unreasonable if it is "greater than necessary to protect the promisee's legitimate interest," or if need is "outweighed by hardship to the promisor and the likely injury to the public." *Nestle*, 836 F. Supp. at 74 (citing Restatement (Second) of Contracts § 188 (1981)). An unreasonable covenant will be partially enforced as needed to protect the employer's legitimate interests if there is no evidence of bad faith. *Durapin*, 559 A.2d at 1058.

Equity Prime's issue is whether the provision is "reasonable." It claims the provision is unreasonable because it prohibits the Individual Defendants from doing business "with any broker with whom Carrington did business" during their time of employment, regardless of whether they had personally worked with that customer. ECF No. 138 at 9. It argues that this renders the provision overbroad and damaging to the public interest. *Id.* at 9-10.

Rhode Island has a partial enforcement approach allowing the Court can find an applicable portion of a non-solicitation clause enforceable even if it were to find a

portion is overbroad. "[U]nless circumstances indicate bad faith or deliberate overreaching on the part of the promisee, a court will attempt to modify an unreasonable covenant and enforce it to an extent that it is reasonably necessary to protect the promisee's legitimate interests, if that can be done without imposing undue hardship on the promisor or adversely affecting the public interest." *Durapin*, 559 A.2d at 1058 (citation omitted).

Carrington asks the Court to partially enforce the non-solicitation clause as it governs solicitation of brokers with whom the former employee had a working relationship because it has a legitimate interest in maintaining those valuable contacts. It essentially asks the Court to rewrite the provision to make it more narrowly restricted to those contacts. The Court finds that the language is unreasonable because it is more than necessary to protect Carrington's interest in its holding on to its brokers after the Carrington employee leaves its employment. The Court also finds that the non-solicitation provision deliberately overreaches in an effort to control its former employees from working in the mortgage business elsewhere. It imposes hardship on the exiting employee by preventing them from competing in the mortgage broker market. The overbreadth nature of this agreement is amplified when one considers the hundreds of brokers a Carrington employee would have encountered during their eight years of employment. Therefore, this non-solicitation provision is unenforceable and there can have been no breach of that provision.

### c.  Did Carrington Suffer Damages from the Breach

Equity Prime argues that Carrington cannot prove that the Individual Defendants' breach caused it damages, while Carrington counters with evidence in an expert report and other data showing causation and damages.

The undisputed facts show that Carrington had to paid retention bonuses to account executives in its Rhode Island office after the first wave of employees resigned.  ECF No. 128 ¶ 132.  Carrington also submitted an expert report in support of its motion analyzing lost profits, which speaks to both damages and causation.  ECF No. 152-1.  Carrington's expert analyzed total loan originations of Mr. DeLory's team, including the account executives who switched from Carrington to Equity Prime in August 2021.  While these calculations may show how these employees' departures could be expected to influence Carrington's bottom line, because the Court has found that there are disputed issues of fact as to breach, it follows that there are disputes over whether the breach was the but-for cause of any actual or projected losses.  A jury weighing all the evidence and expert testimony will resolve these disputes.

In summary, the Court denies Carrington's Motion for Summary Judgment on Count I as to the Individual Defendants.  ECF No. 127.

### B.    Count II–Defend Trade Secrets Act (Messrs. DeLory and Phillips)

Carrington's Defend Trade Secrets Act ("DTSA") claim turns on Messrs. DeLory and Phillips' purported use of confidential information.  "The DTSA . . . provide[s] protections for individuals and entities claiming misappropriation of their

trade secrets." *Allstate Ins. v. Fougere*, 79 F.4th 172, 187 (1st Cir. 2023. A trade secret includes "all forms and types of financial [and] business . . . information" including "patterns, plans, compilations, . . . processes, procedures, programs, or codes" for which (1) the owner took "reasonable means" to keep the information secret, and (2) the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means" by a person to whom it would be valuable. 18 U.S.C. § 1839(3). To prevail, Carrington must show that there is no dispute that Messrs. DeLory and Phillips misappropriated a trade secret; that is, they disclosed or used a trade secret "without express or implied consent" when, at the time of its use, they knew or had reason to know that it was confidential. *Analog Techs., Inc. v. Analog Devices, Inc.*, 105 F.4th 13, 17 (1st Cir. 2023) (citing 18 U.S.C. § 1839(5)(B)).

Carrington argues that Messrs. DeLory and Phillips violated the DTSA by misappropriating confidential business information, including marketing plans, financial information, and information about Carrington's relationships with its brokers. Equity Prime counters that there are disputes over whether the information was a matter of public record, and so not actionable under the DTSA, and that Carrington was not damaged.

Carrington cites to four confidential sources of information to advocate for summary judgment on its DTSA claim: the DeLory Email with the "Inside Account Executive Compensation Plan" attached, the broker database, Mr. Phillips' files, and his Employee List. There are material disputes over each of these sources. As to the

DeLory Email, Carrington alleges that Mr. DeLory emailed an "Inside Account Executive Compensation Plan" to Mr. Perez, which was marked "confidential" and included proprietary compensation information. ECF No. 139 ¶ 53. The Compensation Plan included a breakdown of Carrington's commission structure, a sample monthly commission and payout schedule, and terms of employment (including provisions on confidentiality and non-solicitation).

Equity Prime disputes that the Compensation Plan as attached was confidential. It asserts that it was not a template, was not current, and the notation of confidentiality was essentially hidden at the bottom of the page. *Id.* Carrington bears the burden of proof to show that there was no dispute that the Compensation Plan is a trade secret, and it has failed to do so here. *Celotex*, 477 U.S. at 322. The same is true for the information in Mr. DeLory's email. Thus, the Court finds that there are material facts in dispute.

As for the Broker Database, Carrington claims Mr. DeLory's printer was running "nonstop" as he printed the Carrington broker database in the days before he left Carrington. ECF No. 139 ¶¶ 94-95; ECF No. 143-1 at 7-8. Jeffrey Massotti, a Carrington employee, testified that Mr. DeLory "walked out the door with them waving over his head saying, ['P]aper gold, boys, paper gold.[']." *Id.* Mr. DeLory denies this claim, arguing that Mr. Massotti is not credible and should not be believed. *Id.* This is a material dispute, and it goes to a genuine issue in the case: whether Mr. DeLory "disclosed or used" confidential information. *Analog Techs. Inc.,*

105 F.4th at 17 (citing 18 U.S.C. § 1839(5)(B)). The issue rests on the credibility of witnesses; therefore, these disputed issues are the province of the jury at trial.

As for Mr. Phillips' Work Files that he allegedly downloaded before he resigned and his Employee List containing compensation for other employees, Carrington argues that these files were confidential; Equity Prime suggests that they are not because they were outdated and could easily have been reconstructed from public records. Equity Prime also argues that the information was publicly available on Carrington's website. ECF No. 139 ¶ 93. Again, this issue must go to a jury.

Because there are disputed factual issues and credibility determinations for a jury to make on the claim, the Court denies Carrington's Motion for Summary Judgment on the DTSA claim against Messrs. DeLory and Phillips. ECF No. 127.

## C. Count III—Breach of Duty of Loyalty (Messrs. DeLory and Phillips)

Carrington's claim for breach of duty of loyalty is not duplicative of its breach-of-contract claim as Equity Prime argues although it is rooted in the same conduct. Equity Prime essentially argues that Carrington's motion as to Count III should be denied for the same reasons its motion as to breach of contract should be denied.

Employees in Rhode Island owe a duty of loyalty to their employers. *Rego Displays, Inc. v. Fournier*, 379 A.2d 1098, 1101 (R.I. 1977); *Abbey Med./Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 193 (R.I. 1984). The basis of this duty stems from the employee's knowledge of the employer's customers, coupled with an appreciation of their specific *needs. Id.*; *Baris v. Steinlage*, No. C.A. 99-1302, 2003 WL 23195568, at *19 (R.I. Super. Dec. 12, 2003). "An employee 'breaches the fiduciary trust if he

solicits his employer's customers, appropriates his employer's personality, or entices co-workers away from his employer.'" *Baris*, 2003 WL 23195568, at *19 (quoting *ABC Transnat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1306 (Ill. 1980)). This duty ceases when they are no longer employed. *Long*, 681 A.2d at 253.

Because the Court has found disputed issues of fact as to Carrington's claims for breach of contract based on employee solicitation, a jury should weigh that evidence and determine whether Messrs. DeLory and Phillips breached the duty of loyalty. Thus, the Court denies Carrington's Motion for Summary Judgment on Count III. ECF No. 127.

### D.    Count IV–Tortious Interference with Contract (Equity Prime)

To prevail on summary judgment of its tortious interference claim, Carrington must present undisputed facts that show "(1) the existence of a contract; (2) [Equity Prime's] knowledge of the contract; (3) [its] intentional interference; and (4) damages resulting therefrom." *Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 752 (R.I. 1995) (citation and internal quotations omitted). Additionally, Carrington must show that the interference was "improper." *Avilla v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 98 (R.I. 2007) (citing the Restatement (Second) Torts § 766B, cmt. D. at 22 (1979)). To determine whether interference is "improper," the Court must consider "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interest with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of the social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the

actor's conduct to the interference complained of; and (7) the parties' relationship." *Id.* (citing *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 628 n. 3 (R.I. 2000)).

Summary judgment is not appropriate here, as there are many disputes of material fact as to whether Equity Prime knew of the contracts, intended to interfere with their terms, and whether its conduct was improper. The parties dispute when Equity Prime learned about the alleged breach; Carrington says it was on notice in April 2021 when Mr. Perez received the Inside Account Sales Compensation Plan, which included the confidentiality and non-solicitation terms and Equity Prime claims it was first notified of the confidentiality and non-solicitation terms in August 2021, when Carrington sent the cease-and-desist order. Equity Prime asserts it never read the plans (so Carrington was not harmed by the breach) and disputes whether the information was confidential.

There is also a dispute over whether Equity Prime's conduct was "intentional" after August 2021 when it claims to have received notice. Whether its conduct after this point rose to the level of intentional, improper interference involves many questions of fact. Because there are genuine disputes of material fact, this claim should go to a jury. The Court thus denies Carrington's Motion for Summary Judgment as to Tortious Interference with Contract and denies Equity Prime's Cross-Motion as to the same. ECF Nos. 127 and 125.

     **E.**    **Count V—Aiding & Abetting Breach of Duty of Loyalty (Equity Prime & Mr. Perez)**

Carrington also brings claims against Equity Prime and Mr. Perez for aiding and abetting Messrs. DeLory and Phillips' breach of their duty of loyalty by working

closely to coordinate an exodus of Carrington's employees to Equity Prime. ECF No. 127. Equity Prime cross-moves for summary judgment, maintaining that it had no intention of and did not substantially assist or participate in recruiting other employees. ECF No. 125. It admits it received documents marked "confidential" but says this was incidental and because it did not review them, Carrington was not harmed. *Id.*

To succeed on this claim, Carrington must show that Equity Prime and/or Mr. Perez knew there was a breach and gave "substantial assistance or encouragement to the other so to conduct himself." *Curtin v. Lataille*, 527 A.2d 1130, 1132 (R.I. 1987) (citing Restatement (Second) of Torts § 876(b) (1979)). To determine whether the assistance or encouragement is substantial, the Court should consider "the presence and the state of mind of the alleged aider and abettor, and the relationship between him or her and the principal," "the nature of the act encouraged and the amount of assistance given to the principal." *Id.*

The Court has determined that there are disputed issues over whether here was a breach of fiduciary duty and so ends its analysis there. The Court notes that there are significant disputes over whether Equity Prime provided substantial assistance to Messrs. DeLory and Phillips in any alleged breach of their duty of loyalty. While Carrington highlights Equity Prime's participation in meetings with Carrington folks, Equity Prime denies requesting confidential documents, asking Carrington employees to attend the Recruiting Dinner, inviting no one to the meeting,

and never directly communicating with Messrs. DeLory or Phillips about recruiting Carrington employees during their employment. A jury should decide these disputes.

For these reasons, the Court denies Carrington's Motion for Summary Judgment as to Count V and denies Equity Prime's Cross-Motion as to the same. ECF Nos. 127 and 125.

## IV.    DISCUSSION–COUNTERCLAIMS

Mr. DeLory filed three Counterclaims against Carrington–Counts I (RIWPA) and II (common law retaliatory discharge) are similarly rooted in Carrington's decision to terminate his employment and Count III is for breach of contract relating to his allegation that he was not paid the sums due under an allegedly renegotiated employment contract. Mr. Jackson also filed a breach-of-contract claim (Count III) and two wage claims under FLSA (Count IV) and RIMWA (Count V) for failure to pay overtime. Carrington moves for summary judgment on all Counterclaims. ECF No. 127. Mr. Jackson cross-moves for summary judgment on Counts IV and V. ECF No. 126.

### A.    Counts I and II–RIWPA and Retaliatory Discharge (Mr. DeLory)

Because Counts I and II are analyzed under the same standard, *see Chagnon v. Lifespan Corp.*, C.A. No. 15-493S, 2017 WL 3278952, at *6 (D.R.I. June 19, 2017), *adopted*, 2017 WL 3278858 (Aug. 1, 2017), the Court will address both claims together.

Mr. DeLory alleges that Carrington fired him after he reported: an issue with the underwriting on Veterans Administration ("VA") interest rate reduction refinance loans ("IRRRL"); concerns about the potentially fraudulent signatures by loan officers

on behalf of borrowers in the Retail Division; and discrimination and harassment. Carrington moves for summary judgment, arguing that he does not make a prima facie case of retaliation because none of these complaints qualifies as protected whistleblowing activities.    Even if they were protected, Carrington argues, Mr. DeLory's Counterclaims fail because Carrington had a performance-related reason for terminating him and there is no causal connection between his termination and his complaints.

The RIWPA was enacted "to encourage the prompt reporting and early, amicable resolution of potentially dangerous workplace situations, and to protect those employees who do report such violations from retaliatory action by employers." *Marques v. Fitzgerald*, 99 F.3d 1, 6 (1st Cir. 1996).   "For a *prima facie* case of whistleblowing retaliation, the plaintiff must demonstrate: 1) that []he engaged in protected whistleblowing conduct as defined by the Act; 2) that []he suffered an adverse employment action contemporaneously or thereafter; and 3) that the adverse action was causally related to the protected conduct."   *Chagnon*, 2017 WL 3278952, at *6.   To meet the first element, Mr. DeLory must show that he reported that Carrington was part of a past or imminent violation of the law, not just his belief that Carrington has done something or is about to do something "worthy of criticism or requiring correction."   *Id.* at *7 (quoting *Slay v. Bank of Am. Corp.*, C.A. No. 10-408ML, 2011 WL 1045629, at *12 (D.R.I. March 9, 2011) (*adopted* 2011 WL 938309 (D.R.I. March 16, 2011))).   The second and third elements require not only an adverse employment action–here, termination–but also that the termination be

contemporaneous to the protected conduct and have a "substantial nexus" to the protected conduct.  *Id.* (citations omitted).

As to his first two complaints, Carrington claims that Mr. DeLory cannot possibly be a whistleblower because he learned about the VA IRRRLs and Retail Division signature abnormalities from Carrington management.  ECF No. 128 ¶ 178.  The record seems to show that Carrington was aware of these potential problems, it was investigating them, and took remedial measures, *id.* ¶¶ 169, 172, 174.  And Carrington learned of the Retail Division issues through an anonymous tip that led to an investigation and termination of several employees.  *Id.* ¶¶ 188-92; ECF No. 151 ¶ 295.  Mr. DeLory admitted in his testimony that he was unaware of whether the VA had found "anything wrong with the way Carrington was managing these loans."  ECF No. 128 ¶ 181.  Because there is no evidence that Mr. DeLory alerted Carrington or anyone else to illegal conduct (as opposed to his belief that Carrington had done something or was about to do something "worthy of criticism or requiring correction"), *Chagnon*, 2017 WL 3278952, at *6–7, the Court finds that there is insufficient evidence to show that he engaged in protected whistleblowing conduct about the VA and Retail Division reports.

The final complaint about general discrimination and harassment over time also fails to satisfy the *prima facie* elements.  Mr. DeLory asserts that the real reason he was terminated was because he complained to individuals in Human Resources about an executive's sexist and racist remarks about and conduct toward other employees.  ECF No. 128 ¶¶ 194-97 (complaints about discriminatory conduct in

2018, September 2020, and 2021).  The only evidence on this point is Mr. DeLory's testimony where he continued to be vague as to when he complained to Carrington about the discriminatory and harassing behavior and to whom.  He needs to show "temporal proximity between the whistleblowing and the adverse employment action." *Chagnon*, 2017 WL 3278952, at *7 (citing *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (depending on length of delay, showing of discharge soon after protected conduct can be indirect evidence of causal link).

Mr. DeLory was terminated on August 15, 2021.  He testified that he complained about harassing behavior in 2018, September 2020, and 2021.  The first two reports are between one and three years before his termination–that is not proximate in time to the adverse employment action.  As to the 2021 report, it is unclear whether his report to HR that Mr. Austin was trying to get him to fire a male employee so that Mr. Austin could hire a woman he preferred is even protected conduct.  ECF No. 128 ¶ 196.  And without evidence that this report was made on specific date, the Court cannot find that this report was contemporaneous to his termination.

Even if the Court credits Mr. DeLory's testimony about his reports to HR, it is not specific enough at this stage to meet the causation element which requires more "than pure speculation." *Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 23 (1st Cir. 2010).  It is undisputed that Mr. DeLory testified that he "thinks" these complaints had something to do with his termination.  ECF No. 128 ¶ 198.  Without more, the Court cannot find that he has a claim.  *Chagnon*, 2017 WL 3278952, at *6.  Because

the Court finds that Mr. DeLory fails to make a *prima facie* case for whistleblower retaliation, it ends the discussion here and grants Carrington's Motion for Summary Judgment as to Counterclaims I and II.

### B.    Count III–Breach of Contract[10] (Messrs. DeLory and Jackson)

Mr. DeLory and Carrington had a Sales Compensation Plan that governed his employment.  Carrington appears to concede that Messrs. Austin and DeLory had a phone conversation where Mr. Austin promised Mr. DeLory a more advantageous Compensation Plan.  ECF No. 128 ¶¶ 215-16.  Carrington never paid Mr. DeLory in accordance with the terms discussed over the phone so he now counterclaimed that Carrington breached the amended compensation contract.  Carrington moves for summary judgment on this counterclaim, arguing that the original Sales Compensation Plan was never amended, Mr. Austin misspoke, and the original Sales Compensation Plan remains in effect.

The material facts are undisputed, *id.* ¶¶ 210-223, so the question is whether the conversation between Messrs. Austin and DeLory modified or created a new contract.  "A modification to an enforceable contract requires that the parties assent to the essential terms of their obligations and that an agreement embrace these terms."  *Fondedile, S.A. v. C.E. Maguire, Inc.*, 610 A.2d 87, 92 (R.I. 1992).  "[T]he burden of proving the existence of the modification rests with the party alleging the new contract.  To satisfy this burden, the party alleging the modification must show

---

[10] Mr. Jackson also has a counterclaim for breach of contract based on his claim that Carrington failed to pay him overtime but, because it hinges on the Court's determination of his wage claims in Counts IV and V, the Court will discuss his contract claim in the next section.

that the parties showed both subjective and objective intent to be bound by the new contract's terms." *Id.* (citations omitted).

Nothing in the record suggests that Carrington either subjectively or objectively intended to be bound by Mr. Austin's discussions about a change in Mr. DeLory's compensation over the phone. The Sales Compensation Plan was never amended in writing and when Mr. Austin had orally changed the plan before, it was later changed in writing as well. *See id.* (contract was not modified when the parties' prior practice show that in modifying the original contract defendants manifested objective intent through a written change order). It is also undisputed that Mr. DeLory was never paid under the "new" terms and did not raise this as an error during his employment further showing that neither party believed that the contract was changed. Because the Court finds that the Sales Compensation Plan contract was not modified, Mr. DeLory's counterclaim for breach of contract based on the modified terms fails. The Court grants Carrington's Motion for Summary Judgment as to Mr. DeLory's counterclaim in Count III.

### C.    Counts IV and V–FLSA and RIMWA (Mr. Jackson)

Mr. Jackson counterclaims for unpaid overtime under the FLSA, 29 U.S.C § 207(a) and the RIMWA, R.I. Gen. Laws § 28-12-1.[11]  He says he routinely worked more than forty hours, was not paid time and a half, and was threatened with

---

[11] These claims are analytically similar, so the Court reviews them together. *Sigui v. M&M Commc'ns, Inc.*, No. CV 14-442S, 2015 WL 13717724, at *6 n.3 (D.R.I. Oct. 20, 2015), *adopted*, 2016 WL 1255710 (D.R.I. Mar. 30, 2016).

termination if he tried to claim overtime.[12]  Carrington says Mr. Jackson failed to accurately track hours and was paid for all reported time, including some overtime hours that he did report.  Alternatively, it argues that he has not provided evidence that he worked overtime—or proof of hours worked—to sustain his burden to show he was not paid for all overtime and is eligible for relief.  Both parties cross-move for summary judgment.  ECF Nos. 126 and 127.

To prevail under the FLSA, Mr. Jackson must show that (1) he worked overtime; (2) the amount of overtime he worked; and (3) that Carrington had actual or constructive knowledge that he worked overtime.  *Rueli v. Baystate Health, Inc.*, 835 F.3d 53, 62 (1st Cir. 2016).  Fatal to his claim, the record on summary judgment is short of evidence of the overtime hours Mr. Jackson insists he worked.

Mr. Jackson testified that he regularly worked over forty hours, that Carrington was a "24/7" job where much of the work was done at home where he could not punch in.  He said he took calls out of the office and punched in when he was already at work.  ECF No. 151 ¶¶ 315-18.  He relies on other Carrington employees' testimony that Carrington knew its employees were working overtime and were not being paid.  *Id.* ¶ 319.  Indeed, Carrington, understanding that there are jobs where off-hour work is necessary, had policies and a timecard system in place to track all hours worked and Mr. Jackson did not follow the policies or use the system to record his time.  *Id.* ¶ 311.  Faced with Carrington's records, *id.* ¶ 325, Mr. Jackson has no

---

[12] Mr. Jackson argues that because Carrington acted "willfully," he is entitled to the three-year statute of limitations period under the FLSA, which would provide him with a longer period of recovery.

proof of how many hours over forty that he worked on any given week. *Id.* ¶¶ 324, 326. When pressed during discovery and at his deposition, he could not provide any information about when he worked overtime and how many hours he worked. *Id.* He argues that Carrington discouraged overtime as a reason for not entering all his hours but, without his hours worked or any realistic way to calculate those hours, he cannot show that he worked overtime for which he was not paid. As a result, Mr. Jackson has not carried his burden to prove an essential element of the claim. *Celotex*, 477 U.S. at 322.

The Court thus grants Carrington's Motion for Summary Judgment on Counts IV and V of the Counterclaims (unpaid overtime) and denies Mr. Jackson's cross-motions as to the same. ECF Nos. 126 and 127. And because his breach-of-contract claim rises and falls on his argument that Carrington failed to fully compensate him, the Court grants Carrington's Motion for Summary Judgment on Count III of the Counterclaims. ECF No. 127. Finally, the Court also denies as moot Carrington's Motion to Strike the portion of a deposition where a second attorney asked Mr. Jackson about his overtime hours considering its decision in Carrington's favor. ECF No. 134.

## V.    CONCLUSION

The Court DENIES Carrington's Motion for Summary Judgment as to all its claims. ECF No. 127. *Id.* The Court GRANTS Carrington's Motion for Summary Judgment as to all Defendants' Counterclaims. *Id.*

The Court DENIES Equity Prime's Cross-Motion for Summary Judgment as to Count IV and V.  ECF No. 125.

The Court DENIES Mr. Jackson's Cross-Motion for Summary Judgment as to Counts IV and V of the Counterclaims.  ECF No. 126.

The Court DENIES AS MOOT Carrington's Motion to Strike.  ECF No. 134.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief United States District Judge

November 12, 2024